**Hobert Myrl PORTER, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–14725.**

Court of Criminal Appeals of Oklahoma.

July 7, 1971.

Rehearing Denied Aug. 23, 1971.

Thomas G. Hanlon, Elmore A. Page, Tulsa, for plaintiff in error.

G. T. Blankenship, Atty. Gen., Robert D. McDonald, Asst. Atty. Gen., for defendant in error.

## CORRECTED OPINION

BRETT, Judge.

Hobert Myrl Porter, hereinafter referred to as defendant, was charged, tried and convicted of the crime of Robbery with Firearms in the District Court of Nowata County, and he appeals from the judgment and sentence of five (5) years in the state penitentiary as set by the jury.

The Record reveals that on February 19, 1967, George Hough was robbed by two men when they broke into his home and by means of a firearm forced him to surrender to them approximately Three Thousand ($3,000.00) Dollars in cash. The matter was tried to a jury on December 7, 1967, and the jury returned a verdict on December 8, 1967, finding the defendant guilty of the crime charged and assessed his punishment as indicated above. On rehearing this judgment and sentence is Reversed and Remanded.

The evidence reveals that about 9:00 p. m. on February 19, 1967, two men broke into the home of Mr. George Hough, Sr., and by use of a firearm robbed him of some $3,000.00. He testified at the trial, that the two men wore masks just below their eyes, which hung down over their chins; that they had black capes that came to the top of their boots approximately eighteen inches from the floor; that when he lunged for his gun, they all three fell on the bed and broke it down; and then the two men threw him on the floor and tied his hands and feet. He testified that he identified the defendant by what he could see of his pants and boots, and by his voice; and that at one time he saw the lower jaw of one man, before they put a pillow-case over his head. The two men took his bill-fold out of his right front pocket,[1] where he always carried it, and he testified that it contained some $3,000.00. They ransacked his house and left him tied, but he was able to get his feet loose, and went to his neighbor's house, where his hands were loosened. Defendant's house was searched with a search warrant for any of the items which would tie him into the robbery, but none were found.

The transcript of defendant's preliminary examination was filed with the record of trial. A comparison of the prosecution witness's testimony given at that hearing, with his trial testimony, reveals certain enlargements and minor discrepencies entered at the trial. This conviction was first affirmed, but re-evaluation of the record, supported by additional authorities provided by defendant makes it necessary to reverse defendant's conviction.

In his Petition for Re-Hearing defendant emphasized his third proposition, which complains that the trial court denied him proper cross-examination of Deputy Sheriff Deese Carter, who investigated the robbery. Insofar as this conviction stands or falls on the identification of the alleged robber; and since the victim admitted he did not get a clear view of his assailants; and because there exists some conflict between the victim's testimony as given at the preliminary examination and as it was related at defendant's trial; on reconsideration we believe defendant's contention has merit. This fact coupled with the contentions contained in defendant's petition asking for an evidentiary hearing, in the nature of coram nobis, and the testimony given at that hearing causes defendant's proposition to become more significant. Therefore, we have carefully re-examined the entire record of this trial and reach the conclusion that the defendant was denied proper cross-examination.

On direct examination the prosecutor inquired of the deputy sheriff, concerning his investigation the night of the robbery: (C.M.–141.)

"Q. All right. Did Mr. Hough at any time, Sheriff Carter, identify anybody as having participated in that robbery in his home that night?

A. Yes, sir, he did.

Q. And who did he identify?

A. He said he identified Myrl Porter."

On cross-examination defense counsel inquired of Deputy Carter: (C.M.–142–146.)

Q. "* * * And you testified that you did—that Mr. Porter was identified

---

1. At the preliminary examination he related they took his bill-fold out of his *left front* pocket, where he always carried it.

by Mr. Hough as being one of the people that robbed him?

A. That he named to me, yes, sir.

Q. Yes, did he give you any descriptions of these people?

A. Well, yes, sir, he did. He did give me a description of him.

Q. What was the description he gave you, please, sir?

A. Well, actually—

MR. AMBLER: If your honor please, I think the State is compelled to object. This comes under the class of hearsay testimony, anything that Mr. Hough might have told him. Now we have tried to stay within certain limitations. I think the same limitations apply to the defendant.

MR. PAGE: I'm entitled to know how he identified him. I'm sure—

THE COURT: Objection sustained.

MR. PAGE: Did I understand your Honor that you are—

THE COURT: You did.

MR. PAGE:—that I can't ask this question?

THE COURT: You're correct.

MR. PAGE: Note my exception. I will make this witness my witness, if your Honor please; if I'm placed in that position I will have to do it.

May I proceed now with him as my witness?

MR. AMBLER: I might inquire whether or not he has done it?

MR. PAGE: I am. I'm doing it right now.

THE COURT: Proceed.

### DIRECT EXAMINATION
BY MR. PAGE:

Q. You are my witness now, Mr. Carter. I'll ask you if Mr. George Hough that night advised you how these people were dressed and gave you a description of these people?

A. Yes, sir, he did.

Q. Yes, sir.

A. He did.

Q. Yes, sir. I'll ask you whether he told you that they wore masks?

MR. AMBLER: Objection, your Honor. Leading and suggestive question, I believe.

THE COURT: Sustained.

MR. PAGE: Exception.

Q. Did you determine from him in the course of your investigation as a police officer of this county whether or not these people wore masks?

MR. AMBLER: If your Honor please, the same objection. He can't just turn the question around and say it in a different way.

THE COURT: Sustained.

MR. PAGE: Exception.

Q. Did you determine, Mr. Carter, from your examination and your questioning of Mr. Hough regarding this incident—I'll ask you whether or not he told you how much he saw of the face of any of these people?

A. Yes, sir, he did.

Q. Yes, sir. And what did he tell you he saw?

MR. AMBLER: Just a minute. If your Honor please, I make the same objection. I think it would certainly be hearsay testimony coming from Mr. Carter.

THE COURT: Sustained.

MR. PAGE: If your Honor please, all I'm trying to do is let this jury know what this man told—

THE COURT: Just a minute, Mr. Page.

MR. PAGE: Very well.

THE COURT: You know as well as any lawyer in the State of Oklahoma you can't introduce hearsay evidence.

MR. PAGE: This is in the course of an investigation, if your Honor please, by the police department.

THE COURT: True, but it is still hearsay evidence. You are trying to get him to repeat conversations—what someone told him outside defendant's presence.

MR. PAGE: Very well. Note our exception, if your Honor please.

THE COURT: You might ask if the defendant was there. If the statements were made in the presence of the defendant I think they are admissible.

MR. PAGE: Well, we waive it. We waive it. We are not even trying to enforce our rights. We are the ones that should object to it but we're not objecting.

MR. AMBLER: If your Honor please, I have no authority to waive any rights on behalf of the State of Oklahoma.

MR. PAGE: Well, this defendant—you are not waiving any.

THE COURT: Proceed.

MR. PAGE: Let the record reflect that the defendant waives his right to object to hearsay evidence of this witness.

MR. SONTAG: Let the record show that the State does not so waive any rights of the State of Oklahoma to object to the introduction of hearsay evidence.

MR. PAGE: Well, we understand that. We certainly understand that.

THE COURT: Proceed."

It appears from the record that the testimony of Deputy Sheriff Carter was excluded only as being hearsay testimony, which would have shed some light on the prosecution witness's identification of defendant. We observe the following in Vol. 3A, Wigmore, Evidence, § 1018, p. 996 (Chadbourn rev., 1970):

"In short, *the prior statement is not primarily hearsay,* because it is not offered assertively, i. e., not testimonially. The hearsay rule * * * simply forbids the use of extrajudicial utterances as credible testimonial assertions; the prior contradiction is not offered as a testimonial assertion to be relied upon. It follows, therefore, that the use of prior self-contradictions to discredit is not obnoxious to the hearsay rule. (Emphasis not added.)

" * * * Here, however, by hypothesis the witness is present and subject to cross-examination. There is ample opportunity to test him as to the basis for his former statement. The whole purpose of the hearsay rule has been already satisfied. Hence there is nothing to prevent the tribunal from giving such testimonial credit to the extrajudicial statement as it may seem to deserve * * *."

At this point we are unable to determine whether or not the description of his assailants, as given to the deputy, was contradictory to the description given by Mr. Hough, at defendant's trial. But for some reason the prosecution did not want it entered into the record. In reviewing the record we conclude that the deputy's testimony was admissible as an exception to the hearsay rule, as being part of the res gestae. In short, it would have given the jury a more complete comparison of statements of description, upon which to base their judgment in reaching a verdict. Mr. Hough's courtroom description could have differed materially from that given to the deputy, immediately after the robbery occurred. This is especially pertinent insofar as the prosecuting witness testified at the preliminary examination that the two men wore masks and he could not see their faces, but could only see the lower jaw of one man, and enlarged upon that at the trial. It is pertinent also, because the prosecuting witness testified differently in several other respects at the trial, to that given by him at the preliminary examination. Notwithstanding the fact that those differences are not great when considered singularly, when they are considered together, and coupled with the fact that the first description given of his assailants was prevented from being allowed to go to the jury for some unknown reason, those differences grow in importance. Consequently, we now conclude that it was error when the court denied the cross-examination of the deputy, as asserted by defendant.

From yet another point of view, if defendant's cross-examination of the witness concerning the point in question

was not admissible because it was hearsay evidence, then the prosecution should not have inquired whom the victim identified; and having opened the door on direct examination to the question of indentification, the defense should have been permitted to inquire further into the matter pertaining to the description given.

We observe in Wolf v. State, Okl.Cr., 375 P.2d 283, 286 (1962), the defendant's statement which was made to a third party at the scene of an accident was admissible a being part of the res gestae, merely because it added to and explained the situation. This Court quoting from Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927 (1951), said the following:

"The term 'Res Gestae' means matters incidental to the main fact and explanatory to it, including acts and words which are so closely connected therewith as to constitute a part of the transaction, and without a knowledge of which the main fact might not be properly understood; the events themselves speaking through the instinctive words and acts of the participants, the circumstances, facts and declarations growing out of the main fact, contemporaneous with it and serving to illustrate its character.

"Declarations, to be a part of the res gestae, need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberation or fabrication, then they are to be regarded as contemporaneous, and are admissible as evidence."

See also: Carney v. State, Okl.Cr., 406 P.2d 1003 (1965).

In Smith v. State, 83 Okl.Cr. 209, 175 P.2d 348 (1946), this Court stated:

"As a general rule, statements and declarations by the person injured by the crime are not admissible unless a part of the res gestae, or, within the exception as to dying declarations, unless introduced for impeachment purposes or to show an admission by accused when they were made in his presence."

We can only presume that the defendant was desirous of obtaining the description given to Deputy Carter in an effort to impeach the description given by Mr. Hough at the trial, because it was given immediately after the robbery occurred.

In that respect, we note what this Court said in Cook v. State, 27 Okl.Cr. 215, 226 P. 595 (1924):

"One of the recognized exceptions to the rule that hearsay evidence is not admissible is where spontaneous statements or exclamations are made by an injured person, declaring the circumstances of the injury, where such statements are made immediately after the injury or during such indefinite time thereafter as the stress of pain, fear, or excitement prevents the reflective faculties of the narrator to control, so that the utterances are spontaneous and in direct response to the sensations produced by the physical shock or mental excitement."

See also: Munn v. State, Okl.Cr., 459 P.2d 628 (1969); and Martin v. State, Okl. Cr., 449 P.2d 275 (1969).

The Supreme Court of Iowa stated with reference to declarations of the victim, after the commission of the crime in State v. McClain, 256 Iowa 175, 125 N.W.2d 764, 4 A.L.R.3rd 134 (1964):

"Declarations and exclamations of the person injured are admissible in evidence where they are so connected with the crime as to constitute a part of the res gestae, and this is true whether they incriminate the accused or whether they exculpate him. (Citations.) Spontaniety and such closeness of connection with the transaction as to exclude any presumption of fabrication are the essentials."

In the McClain case, the accused was charged and convicted for Second Degree Murder, in which it was alleged that he poured gasoline on his wife and burned her. The testimony of witnesses who heard her statements, as she sat upon the

front porch with 30 percent of her body burned, accusing her husband, saying, "Mac poured gas on me and burned me up." were admitted over defendant's objections, as being part of the res gestae. See also: Annotations in 3 A.L.R.3d, § 7(a), p. 168.

We must therefore conclude after carefully re-examining this entire record that the defendant was prejudiced by the trial court's refusal to admit the deputy sheriff's testimony, revealing the first description of his assailants given by the prosecution witness, as an exception to the hearsay rule of evidence.

In Fink v. State, Okl.Cr., 480 P.2d 938 (1970), this Court held that it was not error when the trial court permitted the detective to relate the description of the victim's assailant, which she gave soon after the crime was committed. While it was not described as being part of the res gestae, it was allowed to be admitted.

█ While the Petition for Rehearing was pending, defendant filed a Petition for Evidentiary Hearing, in the nature of coram nobis, wherein he asserted that one member of the jury revealed her prejudice toward defendant prior to being called as a juror. This Court directed the trial court to conduct such hearing and on April 12, 1971, the record of evidentiary hearing was filed with this Court. The record reveals that two women, who worked at the same place the juror worked, testified that

they heard the lady—who was later called as a juror—utter a most prejudicial statement concerning the defendant. The juror, who was a lady some seventy years of age, testified that she did not make the statement. However, both witnesses testified that the juror said with reference to the defendant and his guilt, " * * * well if he didn't [commit the robbery] he should be in jail for other things he had done." Consequently, we cannot accept that part of the trial court's findings of fact number three which states with certainty: "That Mrs. Maude Lay did not make the statement attributed to her by Mrs. McCoy and Mrs. Kinnick. * * *" in face of the testimony contained in the record. Also, there is a distinction between this juror's situation and that of the juror's situation found in Gaddis v. State, Okl.Cr., 447 P.2d 42 (1968). However, at this point, we are unable to say with certainty whether or not the juror's influence might have caused defendant's conviction, even if prejudice is assumed. Albeit, considering in conjunction with the other discrepancies in this trial, that the only evidence produced by the state to directly connect the defendant with this crime was the questionable identification of the prosecution witness, a man sixty-two years of age, who under extremely trying circumstances, allegedly gained a very limited observation of one of his assailants and made the identification of the defendant.[2] We therefore conclude that the proper administration of justice

---

2. Vol. 3, Wigmore, Evidence, § 786(a), 205, (Chadbourn rev., 1970).

"Some of the most tragic miscarriages of justice have been due to testimonial errors * * *, the error being chiefly due to imperfect recollection, with the occasional further complication of defective perception and of suggestion. But it is necessary at the outset to distinguish between circumstantial and testimonial evidence to identify.

"(A) *Circumstantial* evidence attempts to infer, from one or more marks characteristic of one person (e. g. a knife scar on the left foot,) to the sameness of that person with another person bearing the same mark or marks. * * * This

inference supposes that the mark has somehow proved or evidenced, and is not concerned with how that proof was effected. But in testimonial evidence the inference is from the simple assertion (of the observer) directly to the identity, and is therefore concerned with the conditions effecting the value of the testimonial assertion. Testimonial evidence as to identity thus brings up the whole question of possible errors in perception, in recollection, and in narration, due to suggestion."

Mr. Hough's identification was allegedly made from seeing eighteen inches of pants leg and boots, the lower jaw, and possibly voice identification.

requires that the defendant be granted a new trial.

We are therefore of the opinion, that defendant's conviction in the District Court of Nowata County, Oklahoma, case No. 2057, should be reversed and remanded to the District Court. It is so ordered.