STATE OF IOWA, appellee, v. EDWARD JAMES BECKWITH, appellant.

## No. 47992.

(Reported in 53 N.W.2d 867)

JUNE 10, 1952.

Glenn B. Beers and W. Louis Beecher, both of Waterloo, for appellant.

Robert L. Larson, Attorney General, and Robert R. Buckmaster, of Waterloo, for appellee.

HAYS, J.—On June 30, 1949, a county attorney's information in the matter of the State of Iowa v. Edward James Beckwith was filed in Grundy County District Court charging a violation of section 690.2, Code of 1946. On September 3, 1949, after an amendment, the information alleged: "The said Edward James Beckwith on or about the 22nd day of June, A.D. 1949, in the County of Grundy and State of Iowa, did willfully, deliberately and with premeditation and malice aforethought, and while attempting to perpetrate rape upon the person of Irma

Jean Stahlhut, murder the said Irma Jean Stahlhut contrary to the provisions of section 690.2 of the 1946 Code of the State of Iowa." Thereafter this defendant entered a plea of "not guilty of the crime of first-degree murder, as charged in the information." Upon defendant's motion for a change of venue the case was transferred to Black Hawk County for trial. The case was tried to a jury which found defendant guilty of murder in the first degree and directed the death penalty. Upon appeal to this court the judgment was reversed and the case remanded. (See State v. Beckwith, 242 Iowa 228, 46 N.W.2d 20.)

The instant case was commenced May 14, 1951, and on May 26, 1951, the jury returned a verdict of guilty of murder in the first degree and directed the death penalty. On July 13, 1951, defendant's motion for a new trial was overruled. Judgment was entered in accordance with the verdict and direction contained therein, and defendant has appealed.

While the plea was "not guilty", there can be no-doubt but that defendant killed Irma Jean Stahlhut, the defense being primarily insanity and intoxication of the defendant at the time the act was committed. The appeal is presented to this court upon four assigned errors. The details of the crime, in general, are set forth in the former appeal and need not be here repeated, except as they bear upon the specific errors assigned.

I. Appellant asserts it was error for the court to try and to sentence the juror, Jeanette M. Watson, in the presence of the jury selected to try the case.

Briefly, after the twelve jurors to try the case had been finally selected by the State and the defendant, Jeanette M. Watson, one of the twelve thus selected, refused to be sworn. Then followed considerable discussion between the juror and the court, which culminated in the juror being sentenced to six months imprisonment in the Women's Reformatory at Rockwell City, Iowa, for contempt of court. This all transpired in the presence of the remaining eleven jurors selected to try the case. That proceeding was before this court in the case of Watson v. Charlton, 243 Iowa 80, 50 N.W.2d 605, wherein a more detailed statement of the facts may be found.

The alleged error is that said episode set off a wave of

844

publicity such as to prevent the defendant from receiving a fair and impartial trial.

The record shows the following: There was a conference in chambers; the defendant, his counsel, counsel for the State and the presiding Judge being present:

"The Court: The matters now before the court require some time for determination, and the court is going to reserve all rulings or actions until tomorrow morning at 9 o'clock. If either party desires to make any record now so that the court may know definitely their position or contention they are now at liberty to do so.

"Mr. Beers: The defendant at this time elects between the alternatives that were given earlier in the afternoon to proceed with the trial of this case with the eleven remaining jurors, without the juror Watson, and waives any errors because of the proceedings with the eleven jurors."

Following some discussion concerning the taking of a photograph in the courtroom, the proceedings continued:

"The Court: Do counsel for the defendant consider that matter of the photograph being taken as prejudicial? [This apparently refers to a photograph taken during the Watson episode.]

"Mr. Beers: I will not so express myself at this time, Your Honor.

"Mr. Beecher: Does the court want us to make an expression on that before——

"The Court: Not unless you care to voluntarily. The purpose of the court in making this record is to have a full and complete record of matters that might possibly be raised by either party; and for the purpose of making a true and correct record which seems to the court to justify a full jury not having been, up to this time, empanelled and sworn, and that the court declare a mistrial in order that the proceedings be recommenced.

"Mr. Beckwith: Oh, no. Let's go ahead.

"Mr. Beers: The defendant resists that at this time for the reason that at least eleven persons on the jury have been sworn. The defendant has been placed in jeopardy on this trial. We

believe that a declaration of a mistrial at this time would be extremely prejudicial to this defendant and that there is no justification in this record for declaring a mistrial. The defendant stands ready and willing to proceed with the trial of· this case and has indicated his willingness to accept the alternative given him earlier in the day by the court to proceed with an eleven-man jury. He stands ready to start the matter of proceeding with the trial immediately with that jury."

Both the State and defendant agreed to proceed with eleven jurors. They were resworn and the trial proceeded. No issue is presented as to the legality of a jury consisting of only eleven jurors.

What the reaction of the eleven jurors was to the Watson matter is unknown. The record is silent thereon. In the trial of any case, be it civil or criminal in nature, many things may, and often do, occur without fault or prior knowledge upon the part of the court or litigants. They may or they may not have a prejudicial effect upon the jury. The presiding judge must, at least in the first instance, determine the course to take and in so doing has broad judicial discretionary powers. Unless clearly abused, this court is slow to disturb the exercise thereof.

The most that the trial court could have done in the instant case was to declare a mistrial and start anew. This the court offered to do if counsel felt prejudice, such as to prevent a fair trial, existed. Both the defendant personally and his counsel specifically objected to such procedure and asked that the trial proceed. Defendant cannot now predicate error upon the court's doing the very thing they requested the court to do. Especially is this true in the absence of any showing of prejudice.

II. Appellant contends it was error for the court to allow the introduction of State's Exhibit 9 in evidence. This exhibit is a photograph of the body of Irma Jean Stahlhut as it was found by the authorities. It is claimed that the exhibit was merely cumulative evidence and its probative value, if any, was far surpassed by its tendency to inflame the minds and passions of the jury against the defendant and thereby deprive him of a fair trial.

Concededly, Exhibit 9 is not a thing of beauty. It portrays

a gruesome and revolting spectacle and it may have aroused passion and resentment in the minds of the jury. Likewise gruesome is the testimony of the various officials and individuals who observed the body and testified in detail as to what they saw. The State had charged the defendant with a specific crime and had the burden of proving such charge beyond a reasonable doubt. In attempting to carry this burden it had to accept matters as it found them and could not be squeamish about it. It was cumulative in the sense that the description of the body as it was found had already been related to the jury. But it also tended to present material details bearing upon the manner in which the crime was committed and the possible motive thereof in a way which statements by witnesses could not as accurately portray.

This court has consistently held, and in line with the great weight of authority, that such photographs are properly admitted in evidence even though they may have a tendency to inflame the minds and passions of the jury. State v. Windahl, 95 Iowa 470, 64 N.W. 420; State v. Williams, 195 Iowa 785, 192 N.W. 901; State v. Heinz, 223 Iowa 1241, 275 N.W. 10, 114 A. L. R. 959. As stated in Commonwealth v. Dreamer, 324 Pa. 220, 224, 188 A. 117, 118, "the crime itself as necessarily revealed by the testimony of those who saw the body and by the physician who made the required post-mortem examination was of such an atrocious character that no mere photographs could add anything to the feelings which would naturally be aroused in the breast of any civilized human being against its perpetrator. These photographs did not convict the defendant of this crime. His conviction was based on other evidence, ample and convincing."

■ Appellant also asserts that the manner in which Exhibit 9 was offered was calculated to arouse passion and prejudice in the minds of the jury. It appears that the exhibit was identified by numerous witnesses as correctly portraying the scene as they observed it, but was not offered into evidence until the State's last witness had so identified it. This was a procedural matter to be determined by counsel for the State. Defendant was given ample opportunity to, and did, object to its admission before it was exhibited to the jury.

III. Appellant asserts further error and states the proposition as follows:

"It was error for the court to allow the State's witness, Dr. Wilbur R. Miller, to state his opinion as to the sanity of the defendant either at the time of his examination of the defendant or at the date of the crime for the reason that his opinion was based partially upon hearsay testimony."

While the plea was "not guilty", the basic defense was that defendant was mentally deranged at the time the act was committed. In support thereof two doctors from the State Hospital at Independence so testified. Upon rebuttal the State called as a witness Dr. Wilbur R. Miller, who is connected with the State Psychopathic Hospital at Iowa City. Two examinations of the defendant were made by him, in July 1949 and in May 1951. Both were made at the State's request and consented to by the defendant through counsel.

When Dr. Miller was called as a witness he stated what the examination was based on, as follows:

"The examination of this—in an examination of this type we secure as much information as we can. It means getting the history of the circumstances under which the unusual behavior may have occurred. It means examining the patient himself directly, by the means of questions and answers. It means the use of psychological tests. It means using a physical examination to determine whether or not there may or may not be any physical disease as the basis for the patient's abnormal behavior. It often indicates, or has indicated, laboratory tests; for example, examination of the blood and spinal fluid. All of this material then is correlated and one looks for possible clues as to indications pointing to mental disease or any other disease." (He stated he went through those steps in this case.)

At this point, under examination by the defense counsel, for the purpose of laying a foundation for objections to his further testimony, it appears that at the time of the examinations the witness had talked with the sheriff and county attorney. He had also examined State's Exhibit 36, the purported confession of the defendant. It was developed that Dr. Miller was not hired

to nor did he treat the defendant; that any opinions he might give would be based upon what defendant told him, and in part on Exhibit 36 and statements by the sheriff and county attorney.

Upon direct examination he was asked:

"Q. Do you have an opinion, doctor, based upon your examination of this defendant alone, without anything extraneous, as to whether or not he had a mental disease? * * * A. Yes, I have an opinion. * * * Q. We won't go into that at this time. I wanted to just clarify that point. Now, doctor, will you indicate to the jury what you developed from your examination of this defendant? Is it understood by you that way, doctor? The information I am asking you now for is information you obtained from the defendant at that time. A. That is what you want now? Q. Yes."

There followed a lengthy statement of matters related by the defendant and results of physical tests made. This statement was received without objection by defendant. Then followed: "Q. Well, doctor, did you find from your examination of this defendant any evidence of mental disease? Any evidence of mental disease or mental unsoundness? * * * I want to add to that question: on June 22, 1949 [being the date the act was committed]." (This was objected to as calling for an opinion which is based partially on personal examination and partially upon hearsay furnished to the doctor by third persons, and upon a personal history of the defendant taken by the doctor himself and upon an entire examination not made for the purpose of treatment.) "A. All I can say is this: That when I examined him on July 7th [1949] there was no evidence of mental disease, and from the history given by the patient, or by the subject and other evidence I assumed there was none on June 22. That's all I can say is that there was none on July 7th, and there was no indication that there was any on June 22, but——. There was no evidence of mental disease."

Appellant relies upon the general rule that the opinion of a medical expert based upon information obtained from third persons out of court is inadmissible. This is the accepted rule in this state, and generally. Hurst v. Chicago, R. I. & P. R. Co., 49 Iowa 76; Switzer v. Baker, 178 Iowa 1063, 160 N.W. 372;

Ipsen v. Ruess, 239 Iowa 1376, 35 N.W.2d 82; 32 C. J. S., Evidence, section 536; 20 Am. Jur., Evidence, section 850; annotations 98 A. L. R. 1109; 175 A. L. R. 274, 287.

Particular stress is placed upon the case of Switzer v. Baker, supra, by appellant, as being determinative of the question here. In that case it appears that the doctor was not treating the patient, made no examination other than asking a few questions, and based his opinion upon this and what other parties had told him. Nor did it appear in the record what he had been told. The testimony was held inadmissible. We find no fault with that decision but cannot see where it is applicable to the instant case.

The doctor stated specifically what his examination of the defendant consisted of. He was to confine his opinion solely to information he obtained from defendant by this examination. We must assume he did such, and upon that basis we are not prepared to say such opinion was inadmissible. Support for this is found in the Switzer case, supra, and is in line with the authorities above-cited. The jury had before it for consideration the facts upon which the opinion was based, not as substantive proof as to the truth thereof but merely to enable it to better evaluate the opinion in the light of the testimony before it. We might add that the defendant, as a witness, was examined at length. See also Silliman v. People, 114 Colo. 130, 162 P.2d 793; Crichton v. United States, 67 App. D. C. 300, 92 F.2d 224; Fuller v. State, 213 Ind. 144, 10 N.E.2d 594; Olson v. Trinity Lodge, 217 Minn. 162, 14 N.W.2d 103.

While not stressed in argument, some importance is attached by appellant to the fact that the doctor made his examination in order to qualify as a witness, and not for treatment. There is a line of authority which holds that under such circumstances the doctor may not state what the patient told him. This is upon the theory that such statements are apt to be colored and self-serving. See Mitchell v. Montgomery Ward & Co., 226 Iowa 956, 285 N.W. 187; Pierce v. Heusinkveld, 234 Iowa 1348, 14 N.W.2d 275. In these cases the objection was not to the opinion given but to specific statements made by the doctor as the basis for the opinion. They were being offered as substantive proof of the facts stated and held inadmissible as hearsay and self-

serving. See also DeLong v. Iowa State Highway Comm., 229 Iowa 700, 295 N.W. 91.

No objection was made to any statement other than the opinion itself. The above cited authorities are not applicable. We think the testimony was proper and find no error in its reception.

IV. Appellant's last assigned error is that the defendant did not receive a fair trial and the motion for a new trial should have been sustained.

Among the things included in the motion for a new trial are the matters already discussed and the fact that though the trial consumed thirteen days, forty minutes for the reading of the instructions by the trial court (and they were not read aloud in the jury room), the jury returned the verdict above-stated after about one hour of deliberation. Burke v. Reiter, 241 Iowa 807, 42 N.W.2d 907, is cited to the effect that a short period of deliberation may be some evidence of error. Trulock v. State, 1 (Clarke) Iowa 515, is cited for the rule that while no one error assigned may be sufficient to warrant a reversal, all considered together may be such as to show that the defendant has not had that full, fair and impartial trial which is secured to him by law and without which no man should suffer its penalty.

Realizing the importance of this case not only to the appellant but to the State, we have carefully examined the entire record with the above rule in mind and find nothing therein which would warrant this court in disturbing the judgment from which this appeal was taken.

Finding no error the judgment of the trial court should be and is affirmed.—Affirmed.

All JUSTICES concur.