# IN THE COURT OF APPEALS OF IOWA

No. 17-1679
Filed May 1, 2019

**DANIEL J. DAWSON,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

The applicant appeals from the denial of his application for postconviction relief challenging his convictions for murder in the second degree; assault with intent to inflict serious injury; and domestic abuse assault, second offense. **AFFIRMED.**

Thomas Hurd of Greenberg & Hurd, LLP, Des Moines, for appellant.

Daniel Dawson, Anamosa, pro se.

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee State.

Considered by Potterfield, P.J., and Mullins and Bower, JJ

**POTTERFIELD, Presiding Judge.**

Daniel Dawson appeals from the denial of his application for postconviction relief (PCR) challenging his convictions for murder in the second degree; assault with intent to inflict serious injury; and domestic abuse assault, second offense. On appeal, Dawson argues for the first time that his trial counsel provided ineffective assistance by failing to move for a mistrial during closing arguments based on prosecutorial error; Dawson maintains all counsel since his first have been ineffective in failing to raise the issue sooner. Dawson raises an additional sixteen claims without the assistance of counsel; we address each one below.

**I. Background Facts and Proceedings.**

In 2005, Dawson was charged with murder in the first degree; willful injury; and domestic abuse assault, third offense. All three charges were based on allegations Dawson beat and stabbed Debra Mead to death in their home in Davenport in August 2005. Dawson pleaded not guilty and filed notices of a self-defense and an intoxication defense.

At trial, Dawson did not deny that he assaulted and then stabbed Mead nor that Mead died as a result of the stab wound. Dawson testified in his own defense that he was angry at Mead for calling his parents while she was drinking, so he hit her in the face and kicked her a few times. Mead then got up from the ground, and Dawson followed her into the kitchen. While in the kitchen, Dawson noticed Mead was reaching for a large knife, so he grabbed it first, and the two struggled over the knife before he stabbed her in the chest.

Dawson called 911, and a recording of the phone call was played for the jury. During the call, Dawson states, "Deb and I got into a [inaudible] fight for the last time" and, "She's pretty much dead," before disconnecting the call. Additionally, the dashboard cameras of some of the responding police officers recorded the scene outside of Dawson's and Mead's home as officers arrived and secured Dawson. In a video that was shown to the jury, Dawson can be heard saying, unprompted: "Oh, she's dead"; "I stabbed her"; "I got tired of getting threatened by her for the last few years"; "No, she'd dead now"; "Fucking bitch ain't threatening me no more"; and "Her psychologist can't save her from this one."

The police officers found Mead lying on the kitchen floor with a knife protruding from her chest; Mead died en route to the hospital. The medical examiner's report indicates Mead suffered multiple blunt trauma injuries, multiple stab wounds, and died as a result of a stab wound to the chest. Dawson was only noted to have one injury—a chunk of skin missing from one knuckle.

After the State rested, Dawson moved for judgment of acquittal regarding the charge of domestic abuse assault, third offense, as his first conviction for domestic abuse assault was too old to qualify as a previous offense. The court granted the State's motion to proceed with the charge of domestic abuse assault, second offense.

The jury returned verdicts finding Dawson guilty of the lesser-included offenses of murder in the second degree and assault with intent to inflict serious injury, which the district court determined merged. Dawson was sentenced to a term of incarceration not to exceed fifty years for the murder conviction. The jury

also found Dawson guilty of domestic abuse assault, and Dawson stipulated to his previous qualifying conviction; he was sentenced to an additional two-year term and ordered to serve the sentences consecutively.

Dawson filed a direct appeal of his conviction, alleging he received ineffective assistance from trial counsel in a number of ways. The supreme court transferred the appeal to us, and a panel of our court affirmed Dawson's convictions, ruling, "Dawson's ineffective assistance of counsel claims fail because he cannot establish the requisite prejudice. The evidence against Dawson is fairly characterized as overwhelming." *State v. Dawson*, No. 06-0390, 2007 WL 1202384, at *3 (Iowa Ct. App. Apr. 25, 2007).

Dawson filed his first application for PCR in 2007 and amended his application five times before it came on for hearing in August 2017. The PCR court denied the application in its entirety.

Dawson appeals.

## II. Standard of Review.

We generally review an appeal from a denial of a PCR application for correction of errors at law. *Goode v. State*, 920 N.W.2d 520, 523 (Iowa 2018). However, when the applicant claims ineffective assistance, because such are constitutional in nature, our review is de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III. Discussion.

Dawson raises seventeen unique claims on appeal. He purports to raise each claim under the ineffective-assistance framework. In order to succeed on a claim of ineffective assistance, Dawson has the burden to prove "(1) counsel

failed to perform an essential duty, and (2) prejudice resulted." *State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both elements must be proved by a preponderance of the evidence. *Ledezma*, 626 N.W.2d at 142. However, we need not consider each element, as Dawson's inability to prove either element is fatal. *See id.*

**1. Prosecutorial Misconduct.** Dawson maintains his trial counsel was ineffective for failing to object to instances of prosecutorial error during closing arguments in his trial. He argues the error was so significant as to deprive him of his right to a fair trial and asks that we remand for new trial. *See State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003) (providing a new trial is the proper remedy for prosecutorial error that results in the denial of a fair trial).

Dawson lists several statements by the prosecutor that Dawson believes constitute error. He generally sorts them into two categories: statements questioning Dawson's credibility and statements expressing personal opinion.

We must begin by determining which, if any, of the now-challenged statements were improper. *See id.* (providing the first requirement for a due process claim based on prosecutorial misconduct is proof of misconduct). As each of the challenged statements were made during the prosecutor's closing arguments, we also note that a "prosecutor 'is entitled to some latitude during closing argument in analyzing the evidence admitted in the trial.'" *Id.* at 874.

Under the first category, Dawson maintains the prosecutor improperly commented on his credibility when he stated: "I'm going to point out some inconsistencies in what the defendant stated"; "Various officers and the squad tape recounted the defendant stating as follows: She threatened me for the last

time, just like on there. I fucking stabbed her with my fucking knife. Her psychologist can't save her from this one. You know something? That's one of the first things he said that's accurate"; and "It's normal for people to minimize their involvement in a situation, in particular in a situation that can result in big trouble for him."

The prosecutor cannot call the defendant a liar. *See id.* at 876. ("We conclude from these cases that Iowa follows the rule that it is improper for a prosecutor to call the defendant a liar, state the defendant is lying, or to make similar disparaging comments."). But it is well within the prosecutor's role "to craft an argument that includes reasonable inferences based on the evidence and . . . when a case turns on which of two conflicting stories is true, [to argue that] certain testimony is not believable." *Id.* (alteration in original) (quotation omitted). Dawson mischaracterizes the prosecutor's statement that he will point out inconsistencies as calling the defendant a liar. Rather, the prosecutor used the facts as Dawson testified to them to raise questions regarding whether Dawson used reasonable force or whether he had an alternative course— necessary elements of the justification defense. The prosecutor pointed out to the jury that Dawson did not sustain any obvious injuries during what Dawson characterized as a struggle for the knife, while Mead suffered three stab wounds. Additionally, Dawson admitted that he started the physical fight by hitting Mead in the head, shoving her to the ground, and kicking her in the head a couple more times before she was able to stand; after Mead got up and walked away, it was Dawson who followed her into the kitchen.

Additionally, the jury was instructed to consider, when deciding what testimony to believe, the witness's "interest in the trial, their motive, candor, bias and prejudice." We understand the prosecutor's statement that, "It's normal for people to minimize their involvement in a situation, in particular in a situation that can result in big trouble for him," as one meant to point out to the jury that Dawson—who was the only living witness to the events that happened on the night of the stabbing—was not an unbiased witness. We do not find either of these statements by the prosecutor to be improper.

Next we consider the second category of statements Dawson challenges—statements expressing the prosecutor's personal opinion. Here, Dawson challenges the following statements: "I guess I would classify death as a serious injury"; "I didn't see any injuries on him"; and "I'm going to give you the State's scenario of what happened."

It is improper for a prosecutor to express his or her personal beliefs or opinions. *See id.* at 874; *see also Beaugureau v. State*, 56 P.3d 626, 632 (Wyo. 2002) (observing that when a prosecutor asserts his or her personal opinions, "the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of" his or her position as prosecutor). But the use of the personal pronoun alone does not constitute reversible error. *See State v. Williams*, 334 N.W.2d 742, 745 (Iowa 1983) (finding prosecutor's use of "I" during closing arguments was not misconduct because, "[v]iewed in context, all of the proecutor's challenged remarks were obviously based on his view of the evidence."); *State v. Dunn*, No. 15-0428, 2016 WL 3003374, at *5 (Iowa Ct. App. May, 25, 2016) (recognizing the prosecutor's use of "I" "brought to the jury's

attention the individual point of view" but ruling it was not prosecutorial error when the statements were "related to the summation of the evidence" rather than "personal assessments" of the prosecutor).

While the first two statements Dawson challenges may have been made in a sarcastic or familiar tone, the basis of the prosecutor's statements was the evidence admitted at trial. *See State v. Carey*, 709 N.W.2d 547, 555 (Iowa 2006) ("These three comments, while sarcastic and snide, were based on a legitimate assessment of the evidence and . . . did not constitute misconduct, given the considerable latitude accorded to lawyers in final arguments."). We look less favorably on the prosecutor's remark that he was "going to give you the State's scenario of what happened," as we believe it encouraged the jury to consider the scenario he then described—one in which Dawson stabbed Mead out of anger rather than self-defense—as one given "the imprimatur of the Government." *State v. Martens*, 521 N.W.2d 768, 772 (Iowa Ct. App. 1994).

Of the statements specifically challenged by Dawson, we find the prosecutor's statements, "That's one of the first things he said that's accurate," and "I'm going to give you the State's scenario of what happened," are improper. To show a denial of due process, Dawson must establish that these two comments deprived him of a fair trial. *See Graves*, 668 N.W.2d at 876. In other words, "we must determine whether there is a reasonable probability the prosecutor's misconduct prejudiced, inflamed or misled the jurors so as to prompt them to convict the defendant for reasons other than the evidence introduced at trial and the law as contained in the court's instructions." *Id.* at 877. In doing so, we consider "(1) the severity and pervasiveness of the misconduct, (2) the

significance of the misconduct to the central issues in the case, (3) the strength of the State's evidence, (4) the use of cautionary instructions or other curative measures, and (5) the extent to which the defense invited the misconduct." *Id.* at 869 (citations omitted).

Two improper statements are not "pervasive" statements. But one statement called into question Dawson's credibility while the other suggested the prosecutor had the "official" version of the facts in dispute—central issues in the case. However, even if we concluded that Dawson's right to due process was violated, we cannot conclude Dawson suffered *Strickland* prejudice. *See id.* at 881 (providing that after concluding a due process violation occurred, the next step is to turn to an analysis of the ineffective-assistance-of-counsel claims). "The most important factor under the test for prejudice is the strength of the State's case." *Carey*, 709 N.W.2d at 559. And here, the evidence against Dawson was strong. Dawson admitted he was the person who stabbed Mead; the only question was if he was justified in doing so. Dawson claimed he struggled with Mead over the knife before ultimately stabbing her to save himself. But pictures taken from the night of the incident show Dawson, who was taller and heavier than Mead, was uninjured other than on one of his knuckles, while Mead was badly bruised and stabbed three times. In his testimony, Dawson admitted he was angry at Mead and started a physical fight with her that night. He also admitted that when she fled to the kitchen after he kicked her repeatedly in the head, he followed her into the room. Audio and video captured the night of the incident show Dawson making comments that Mead is dead, that she will not

be able to threaten him anymore, and "Her psychologist can't save her from this one."

Even if we assume a due process violation, Dawson cannot establish *Strickland* prejudice, so this claim fails.

**2. Merger.** Dawson argues his convictions for domestic abuse assault and murder in the second degree should merge because "[t]he evidence at trial was presented as one continuous course of conduct, without evidence as two distinct crimes." He claims trial counsel was ineffective for failing to challenge the two convictions on double jeopardy grounds. While Dawson is correct that the Fifth Amendment protects against multiple punishments for the same offense, multiple legislatively-created punishments are constitutionally permissible "if a requisite element of one offense is not necessarily essential to conviction of another offense." *See State v. McKettrick*, 480 N.W.2d 52, 56, 57 (Iowa 1992). "In such a case, the offenses are not the 'same' because 'each provision requires proof of an additional fact which the other does not.'" *Id.* at 57 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

Moreover, the Fifth Amendment is not implicated here, as the two convictions were not based on the same act by Dawson. *See State v. Smith*, 573 N.W.2d 14, 19 (Iowa 1997); *State v. Delap*, 466 N.W.2d 264, 264 (Iowa Ct. App. 1990) (defendant could be convicted under both sections 708.2(1) and 708.2(2) where defendant had committed a series of assaults); *see also State v. Heemstra,* 721 N.W.2d 549, 557 (Iowa 2006) (noting in discussing merger of willful injury and felony-murder convictions that "if defendant assaulted the victim twice, first without killing him and second with fatal results, the former could be

considered as a predicate felony, but the second could not because it would be merged with the murder"). Under either a "break-in-the-action test" or a "completed-acts test," *see State v. Velez*, 829 N.W.2d 572, 582–84 (Iowa 2013), Dawson committed two separate actions as the basis for the two crimes. According to his own testimony, he hit Mead across the face and then kicked her several times while she was on the ground. She then stood up and made her way into another room of the home, where Dawson followed her, before grabbing the knife and ultimately stabbing her with it.

Because his convictions for domestic abuse assault and second-degree murder were based on separate acts, there is no merit to Dawson's merger claim, and counsel had no duty to pursue it. *See State v. Carroll*, 767 N.W.2d 638, 645 (Iowa 2009) ("[C]ounsel has no duty to pursue a meritless issue.").

**3. Felony Murder.** Dawson maintains his trial counsel provided ineffective assistance when she failed to challenge the use of domestic abuse assault—once it got changed from a third offense to second offense—as the predicate offense to support a conviction for felony murder. But the jury was not instructed it could use domestic abuse assault as the predicate felony for felony murder; it was instructed:

> Under count 1 the State must prove all of the following of elements of murder in the first degree:
> 1. On or about the 18th day of August, 2005, the defendant stabbed Debra S. Mead.
> 2. Debra S. Mead died as a result of being stabbed.
> 3. The defendant acted with malice aforethought.
> 4. The defendant (a) acted willfully, deliberately, premeditatedly and with a specific intent to kill Debra S. Mead or (b) was participating in the offense of willful injury.

Moreover, Dawson cannot establish prejudice, as he was not convicted of felony murder; he was convicted of second-degree murder. *Cf.* Iowa Code § 707.2(2) (2005) (providing that a person "commits murder in the first degree when the person" "kills another person while participating in a forcible felony"). This claim fails.

**4. Expert in Support of Defense.** Dawson claims his trial counsel provided ineffective assistance by failing to retain an expert pathologist to dispute the State's expert. He maintains the expert "could have disputed the State pathologist's finding of which and how aggressive the fight between [him] and [Mead] had actually been."

During her deposition, which was taken for the purpose of Dawson's PCR trial, the trial attorney was asked if she had considered hiring an expert. She stated:

> [Dawson's] defense was not that [Mead] was—how she died was— maybe the circumstances surrounding how she died, but she died of a stab wound. He was going to argue that they fought over a knife, perhaps. And if you went into that, then my own expert is going to kill me because he doesn't have any injuries on him. I think the less I brought that up to the court—to the jury, the better off we were going to be. So the mechanism of her death, that she was stabbed in the place that she was stabbed, causing her pretty quick death, wasn't an issue for us to argue about, it was how did she get stabbed that we cared about.

There is no bright-line duty for an attorney to retain an expert. *See, e.g.*, *Heaton v. State*, 420 N.W.2d 429, 432 (Iowa 1988) ("We believe that the question of whether or not to call an expert witness is a matter of trial strategy."). And here, counsel considered whether an expert would benefit her client and made a reasonable tactical decision not to hire one. "In determining whether an attorney

failed in performance of an essential duty, we avoid second-guessing reasonable trial strategy." *Everett v. State*, 789 N.W.2d 151, 158 (Iowa 2010). Additionally, even if we believed a competent attorney would hire an expert in this circumstance, Dawson cannot establish that he was prejudiced by counsel's failure to do so, as he called an expert at his PCR trial, and the expert testified both that Mead's wounds were neither "inconsistent with an accidental stabbing" nor "inconsistent with intentional stabbing." This claim fails.

**5. Lack of Objections.** Dawson argues trial counsel provided ineffective assistance because she "only made one objection for the defendant" and "failed to object to jury instructions." He does not identify any specific objections he believes counsel could have successfully made nor explain how the failure to do so prejudiced him. "When complaining about the adequacy of an attorney's representation, it is not enough to simply claim that counsel should have done a better job. The applicant must state the specific ways in which counsel's performance was inadequate and identify how competent representation probably would have changed the outcome." *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994) (citation omitted). This claim fails.

**6. Failure to File Pre-Trial Motions.** Dawson maintains counsel had a duty to file a number of pre-trial motions. We consider each in turn.

First, Dawson argues trial counsel had a duty to file a motion for bill of particulars "because the trial information is insufficient and did not set forth the elements of the offense(s) charged." By rule, a trial information is required to include the name of accused; "the name and if provided by law the degree of the offense, identifying by number the statutory provision or provisions alleged to

have been violated"; a brief statement of the time or place of the offense (when the time or place is a material ingredient of the offense); and a brief statement of the acts or omissions by which the offense is alleged to have been committed (when the means are necessary to the charge). *See* Iowa R. Crim. P. 2.4(7). Dawson does not specify how the trial information was deficient or what information counsel should have sought in a motion for a bill of particulars. And he does not explain how his preparation for his defense was impeded by any lack of information. *See State v. Griffin*, 386 N.W.2d 529, 531 (Iowa Ct. App. 1986) ("If the defendant is apprised of the particulars of the offense sufficiently from whatever source to fairly enable him to prepare a defense, failure to include particulars in the trial information is not fatal." Any claim regarding a bill of particulars has been waived. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments.").

Second, Dawson argues trial counsel should have filed a motion in limine asking the court to exclude from trial the evidence of Dawson's prior bad acts of perpetrating domestic violence against Mead. But such evidence was admissible to show his intent within the murder charge. *See State v. Taylor*, 689 N.W.2d 116, 125–26 ("The most obvious example of the legitimate use of prior-bad-acts evidence is the admission of evidence of a defendant's prior assaults of a victim in a prosecution of the defendant for the subsequent murder of the victim. Courts have admitted such evidence to show the defendant's motive and intent with respect to the actions giving rise to the charged crime when intent is disputed.").

Counsel had no duty to pursue this meritless issue. *See Carroll*, 767 N.W.2d at 645.

Third, Dawson claims trial counsel should have filed a motion to suppress the evidence of Dawson's 911 call, during which Dawson made incriminating statements. Insofar as Dawson claims the admission of the call violated his Fifth Amendment right against self-incrimination, "[t]he fifth amendment's guarantees do not 'protect a defendant from his [or her] own compulsions or internally-applied pressure which are not the product of police action.'" *State v. Countryman*, 572 N.W.2d 553, 558–59 (Iowa 1997) (alteration in original) (citation omitted). Dawson was home alone when he chose to call 911 and make statements about what had just occurred between him and Mead—there was no external pressure causing him to make the statements. Additionally, Dawson maintains his *Miranda* rights warnings were violated, so the evidence of the call must be suppressed. But "*Miranda* warnings are only required if, at the time of police questioning, the suspect is both: 1) in custody, and 2) subject to interrogation." *State v. Tyler*, 867 N.W.2d 136, 171 (Iowa 2015). And again, Dawson was home, without a police presence when he called 911.

Dawson has not proved that any of the pre-trial motions he contends counsel should have made would have been successful, so his claim fails.

**7. Pretrial Discovery: Police Records.** Dawson maintains trial counsel should have acquired Mead's criminal records in order to assist in building Dawson's defense of justifiable homicide. He maintains the records would make it clear Mead "has violent rage against different men in her past, and that it is not far-fetched that she could become violent against" Dawson. This claim is barred

by res judicata, as our court rejected this claim on the merits in Dawson's direct appeal. *See Dawson*, 2007 WL 1202384, at *2, 3 (ruling that Dawson cannot establish prejudice for any of his claims of ineffective assistance, including his claim that "[t]rial counsel's failure to obtain victim's medical/criminal record . . . denied him his right to present a defense," because the evidence of Dawson's guilt "is fairly characterized as overwhelming"); *see also State v. Wetzel*, 192 N.W.2d 762, 764 (Iowa 1971) ("A postconviction proceeding is not intended as a vehicle for relitigation, on the same factual basis, of issues previously adjudicated, and the principle of Res Judicata bars additional litigation on this point." (citation omitted)).

**8. Use of Peremptory Strikes.** Dawson claims trial counsel should have challenged the State's use of peremptory strikes to remove male jurors as a violation of the Equal Protection Clause. *See Kiray v. Hy-Vee, Inc.*, 716 N.W.2d 193, 205 (Iowa 2006) (recognizing the Supreme Court extended its ruling that discrimination against jurors based on their race violates the Equal Protection Clause to apply to discrimination against jurors based on their gender (citing *J.E.B. v. Alabama*, 511 U.S. 127, 145 (1994))).

At a deposition for Dawson's PCR action, trial counsel was asked about Dawson being tried by a jury that was comprised of eleven women and one man. Counsel explained her strategy, stating:

> In cases where it is a domestic violence with a defendant being the male in the relationship I find that older white men often when you ask them say never under any circumstances do you ever hit a woman. . . . Those tend to be very dangerous jurors for a male facing the murder of a female in a domestic relationship. Those are engrained in those gentlemen, they apply it, and they would definitely have applied to [Dawson's] detriment in this case,

particularly because there was a knife involved and he's a strong young man, he should be able to push this woman, who is smaller than him, off of him without any trouble or leave her without having to kill her or protect himself from her, because that was going to be his defense. . . .  [T]he other thing I factor into a domestic is, if you have females, they don't have that guys-should-not-ever-hit-a-woman, they also tend to judge other females quite harshly . . . . And so—I'm excluding women that have experienced domestic violence, have knowledge about domestic violence, have workplace, maybe, education about domestic violence from this kind of generalization, but women who have not had those experiences or education often are more amenable to the defense in a domestic violence case where we have mutual combat going on.  They're going to see her as more of an equal in that fight, more as a menace to him, equal to his menace to her if they're fighting.  So I would have wanted that category of women or been more favorable—favorably leaning toward women in that category. . . .

Counsel made a choice to try to get more women on the jury, as she believed—based on her experience trying cases that involved domestic violence—that women were more likely to be sympathetic jurors for Dawson.  Given the strategic nature of the decision not to challenge the State's use of strikes against men, we will not second guess trial counsel.  *See Hinkle v. State*, 290 N.W.2d 28, 30 (Iowa 1980) ("The required examination [in claims of ineffective assistance] should proceed while resisting, in the light of hindsight, the temptation to Monday morning quarterback the lawyer in the arena.").  Because we presume counsel is competent, improvident trial strategy or miscalculated tactics is not enough to show ineffective assistance.  *State v. Aldape*, 307 N.W.2d 32, 42 (Iowa 1981).  This claim fails.

**9. Motion to Suppress: Squad Car Video.**  Dawson maintains trial counsel should have filed a motion to suppress the evidence of his statements that were captured by the squad car video.  He maintains his *Miranda* rights were violated, so the evidence of the call must be suppressed.  But "*Miranda* warnings

are only required if, at the time of police questioning, the suspect is both: 1) in custody, and 2) subject to interrogation." *State v. Tyler*, 867 N.W.2d 136, 171 (Iowa 2015). At the time Dawson made the statements, he was in police custody. However, his statements were spontaneous and unsolicited rather than the product of interrogation. *See State v. Turner*, 630 N.W.2d 601, 608 (Iowa 2001) ("Statements made after a person is taken into custody are not automatically considered the product of interrogation. Thus, statements that are volunteered, spontaneous and freely made by an arrested person do not come within the scope of *Miranda*." (citation omitted)).

In the same vein, Dawson maintains trial counsel should have hired an expert to establish that his statements were involuntary because they were the product of confusion and made under the influence of alcohol. First, we note that "[b]eing 'under the influence' does not, standing alone, render inculpatory statements involuntary." *State v. Edman*, 452 N.W.2d 169, 170 (Iowa 1990). Second, the evidence at trial did not establish that Dawson was under the influence to the extent that his statements would be rendered involuntary. One or two of the officers who spoke with Dawson on the night of the stabbing indicated they could smell the odor of alcohol when they were near him, and Dawson testified he consumed approximately fourteen beers in the approximately six hours before the stabbing. But all of the officers who were asked testified that Dawson did not have trouble communicating and did not appear to be intoxicated. Additionally, the 911 call and the squad car video show Dawson was able to speak clearly and completely. Finally, it is not enough for

Dawson to make a bald assertion that an expert would have helped to get his statements suppressed as involuntary. This claims fails.

**10. Testimony of Detective Richard Voy.** Dawson argues trial counsel should have objected to Detective Richard Voy's testimony as improper prior-bad-acts evidence, hearsay, irrelevant, and high prejudicial. Dawson does not specify to which questions counsel should have interposed an objection, instead providing a span of nearly twenty pages of trial transcript Dawson finds objectionable. We will not comb through Detective Voy's testimony and search for statements that may fall within the evidentiary objections Dawson has now outlined; this claim lacks sufficient specificity for our consideration. *See State v. Philpott,* 702 N.W.2d 500, 504 (Iowa 2005) ("We will decline to consider arguments that do not pinpoint specific questions and objections the overruling of which is alleged to be error. Defendant's arguments on the evidentiary issues are too vague and indefinite to support the granting of relief based on the admission of improper evidence.").

**11. Second Attorney.** Dawson claims his trial counsel was ineffective for failing to seek an additional attorney to assist at trial, pursuant to Iowa Code section 815.10(1), which provides: "Only one attorney shall be appointed in all cases, except that in class "A" felony cases the court may appoint two attorneys."

While the court may have appointed a second attorney if one was requested, Dawson does not explain how the lack of a second lawyer affected the outcome of his case. "'[C]onclusory claims of prejudice' are not sufficient to satisfy the prejudice element." *State v. Tate*, 710 N.W.2d 237, 241 (Iowa 2006) (citation omitted)). This claim fails.

**12. Motion for New Trial.** Dawson maintains trial counsel was ineffective by failing to file a motion for new trial and motion in arrest of judgment. In support of this claim, Dawson argues: "It is evidence this trial counsel in essence was advocating on the State's behalf to insure a conviction, counsel wholly failed applicant's legal needs at trial, sentencing, and in the development of an effective appeal."

Dawson has provided no cite to the record. *See* Iowa R. App. P. 6.903(2)(g)(3) (requiring the appellant's brief to include "an argument containing the appellant's contentions and the reasons for them with citations to the authorities relied on and references to the pertinent parts of the record"). And as stated before, as the applicant claiming ineffective assistance, he has the burden to pinpoint specific deficiencies in counsel's performance; complaints that are too general and unwieldy in nature evade our review. *See Dunbar*, 515 N.W.2d at 15.

**13. Raising Claims of Ineffective Assistance on Direct Appeal.** Dawson argues his direct appeal counsel provided ineffective assistance by failing "to move the Iowa Court of Appeal to preserve all" of Dawson's "pro se ineffective trial counsel issues" for PCR proceedings. First, Dawson may not use the PCR proceedings as a vehicle to collaterally attack our rulings on direct appeal. *See, e.g.*, *Miller v. State*, No. 13-1240, 2015 WL 1815903, at *3 (Iowa Ct. App. Apr. 22, 2015) ("The issues identified above are, in effect, direct attacks on this court's holding on direct appeal. Under our rules of appellate procedure, [the applicant's] remedy was to seek further review of our decision from our supreme court. . . . Our decision on direct appeal is thus final as to all issues

decided therein and is binding upon both the PCR court and this court in subsequent appeals." (citations omitted)). Second, Dawson cannot now complain that this court did as he asked of it—decide his claims of ineffective assistance. *See State v. Beckwith*, 53 N.W.2d 867, 869 (Iowa 1952) ("Defendant cannot now predicate error upon the court's doing the very thing they requested the court do so."). And third, even if we were to consider Dawson's current complaint under the ineffective-assistance framework, Dawson cannot establish prejudice. While Dawson now implies that his direct appeal PCR claims would have been decided differently if they had been preserved for further development of the record, our court already ruled the record was adequate to decide the claims. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) (recognizing it is the court's role to determine if the record is adequate to decide the claim on direct appeal); *Dawson*, 2007 WL 1202384, at *2.

**14. Court of Appeals Decision.** Dawson argues the court of appeals "abused its discretion when it failed to preserve all pro se ineffective assistance of trial counsel claims for" PCR proceedings. As stated before, Dawson may not use his PCR proceedings as a vehicle to attack a prior appellate ruling. *See State v. Ragland*, 812 N.W.2d 654, 658 (Iowa 2012) (applying the law-of-the-case doctrine to a defendant's PCR challenge); *Bahl v. City of Asbury*, 725 N.W.2d 317, 321 (Iowa 2006) ("Under the law of the case doctrine, 'an appellate decision becomes the law of the case and is controlling on both the trial court and on any further appeals in the same case.'" (citation omitted)). We "refuse to reconsider what has once been decided." *State v. Grosvenor*, 402 N.W.2d 402, 405 (Iowa 1987).

**15. Pretrial Discovery: Medical Records.** Dawson maintains trial counsel should have acquired Mead's medical records in order to bolster Dawson's defense of justifiable homicide. He claims the records would show Mead "was on psychiatric drugs to treat her character traits of unmanageable violent behavior." This claim is barred by res judicata, as our court rejected this claim on the merits in Dawson's direct appeal. *See Dawson*, 2007 WL 1202384, at *2, 3 (ruling that Dawson cannot establish prejudice for any of his claims of ineffective assistance, including his claim that "[t]rial counsel's failure to obtain victim's medical/criminal record . . . denied him his right to present a defense," because the evidence of Dawson's guilt "is fairly characterized as overwhelming").

**16. Second-Degree Murder**. Dawson maintains his trial counsel and direct appeal counsel provided ineffective assistance in failing to challenge whether second-degree murder is a specific intent crime. Dawson reasons that because the supreme court has ruled assault is a specific intent crime, *see State v. Heard*, 636 N.W.2d 227, 231 (Iowa 2001), second-degree murder may be as well. But murder in the second degree has long been, and remains today, a general intent crime. *See State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003) ("Malice aforethought is . . . an essential element of second-degree murder and is an element that separates second-degree murder from other lesser included offenses."); *see also State v. Tyler*, 873 N.W.2d 741, 751 (Iowa 2016) ("We recently elaborated on the distinction between malice aforethought and specific intent to kill . . . emphasizing that the former concept is broader than the latter."); *State v. Gibbons*, 120 N.W. 474, 475 (Iowa 1909) ("The crime of murder in the

second degree necessarily involves an act done with malice aforethought. But that term used in defining the crime is technical rather than descriptive. It does not necessarily require an intent to murder." (citation omitted)). This claim fails.

**17. Domestic Abuse Assault, Third Offense.** Dawson complains that the jury was informed that he was charged with domestic abuse assault, third offense, when the court later recognized—on Dawson's counsel's motion—that one of the underlying offenses was too far removed in time to be considered for enhancement purposes. Dawson maintains trial counsel had a duty to move for mistrial and request a new jury that had not been misinformed of the offense or, in the alterative, to request a curative instruction to inform the jury of the change to the charge.[1]

We agree with Dawson that the jury was wrongly informed about the charge; during the reading of the trial information, the prosecutor indicated Dawson had been charged with domestic abuse assault, third offense. But we cannot find *Strickland* prejudice. Dawson's trial strategy included admitting to the domestic abuse assault charge. In his testimony, Dawson testified that he struck Mead's face with his hand, shoved her to the ground, and kicked her in the head a couple of times while she remained on the ground. Additionally, during closing argument, Dawson's attorney stated, "He assaulted Deb. There's no question about that. The State has certainly proven that through the pictures, the injuries and the defendant's testimony about hitting and kicking her. No. 3, guilty. We're

---

[1] In his heading for this argument section, Dawson urges that trial counsel was ineffective for "failing to challenge the use of domestic abuse third offense in the jury instructions submitted to the jury." We have reviewed the jury instructions given to the jury, and count 3 of the charges is not referred to as domestic abuse assault, third offense.

not even going there." Moreover, the jury would have been aware of Dawson's history of domestic violence even if it was not informed he was charged with a third offense because Dawson admitted during his testimony that he and Mead "had physical fights" "five or six times total" during their three-year relationship.

Because Dawson cannot establish prejudice, this claim fails.

**IV. Conclusion.**

Having considered each of Dawson's seventeen claims of ineffective assistance and finding no reversible error, we affirm the denial of Dawson's application for PCR.

**AFFIRMED.**